IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| SEALE & ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-01282-GBL-IDD |
| | ) | |
| INGERSOLL-RAND CO., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on the Parties' Cross-Motions for Summary Judgment. (Docs 51, 54). This case arises from an Engagement Agreement ("Agreement") between Plaintiff Seale & Associates, Inc. ("Seale") and Defendant Ingersoll-Rand Company and its predecessor, American Standard Companies, Inc. ("American Standard"), wherein Seale agreed to serve as American Standard's exclusive agent to assist with the sale of its Cal-O-Rex water heater business ("Cal-O-Rex"). In the event of a successful sale of Cal-O-Rex, American Standard and its successors, as outlined in the Agreement, agreed to pay Seale a percentage of all "Proceeds"[1] derived from the sale. There are four issues before the Court.

The first issue is whether, under the Agreement, Ingersoll-Rand is required to pay Seale 5% of all Proceeds Ingersoll-Rand receives, as a result of the Cal-O-Rex sale. The Court holds that under the unambiguous language of the Agreement alone, Ingersoll-Rand, as the successor to American Standard, is required to pay Seale 5% of all Proceeds from the Cal-O-Rex sale. In light of the Agreement's unambiguous language requiring such payment, the Court need not review evidence outside of the Agreement.

---

[1] Proceeds, when written with a capital "P" denotes "Proceeds" as defined by the Engagement Agreement.

The second issue is whether Grupo Industrial Saltillo's ("GIS")—the purchaser of Cal-O-Rex—continued royalty payments to Ingersoll-Rand constitute "Proceeds" as defined under the Agreement. The Court holds that, because GIS' royalty payments to Ingersoll-Rand are derived from the sale of Cal-O-Rex and are contingent upon GIS' successful sale of the water heaters bearing the American Standard trademark, such payments are "Proceeds" as defined in the Agreement.

The third issue is, even if Ingersoll-Rand and American Standard were required to pay Seale 5% of such Proceeds, whether the Termination paragraph in the Agreement limited Seale's receipt of Proceeds to either (1) one year after the Agreement was executed or (2) thirty-six months after the Agreement was terminated. The Court finds that although the Termination paragraph includes such time limitations, neither limitation applies to Seale's receipt of the continual Proceeds.  Further, interpreting the Termination paragraph as limiting Seale's Proceeds to either (1) one year or (2) one year and thirty-six months conflicts with the plain language of numerous provisions within the Agreement, as well as the clear intent of the original parties.

Finally, the fourth issue is whether Ingersoll-Rand is required to reimburse Seale for its costs and attorneys' fees in connection with this case. Under the plain language of paragraph 6 of the Agreement, American Standard agreed to indemnify Seale for "any" costs and attorneys' fees arising from the Agreement. In light of this, the Court declines to read paragraph 6 narrowly and holds that Ingersoll-Rand, as American Standard's successor, must reimburse Seale for its total costs and attorneys' fees incurred within this case.

In light of the foregoing, the Court GRANTS Plaintiff Seale & Associates, Inc.'s Motion for Summary Judgment and DENIES Defendant Ingersoll-Rand Company's Motion for Summary Judgment.

## I.    BACKGROUND

In 2000, American Standard Companies, Inc. ("American Standard") sought to divest itself of its Trane Cal-O-Rex water heater business[2]. (Doc. 1 at 2). To do so, on May 8, 2000, American Standard and Seale & Associates, LLC entered into an Engagement Agreement ("Agreement") whereby Seale & Associates, LLC (predecessor to Seale & Associates, Inc. and also referred to herein as "Seale & Associates" or "Seale") would serve as American Standard's exclusive agent to assist in the sale of all or part of the Cal-O-Rex water heater business ("Cal-O-Rex"). *Id.* at 2-3.

The Agreement provided that Seale was to receive a $100,000 up-front retainer and, in the event of a successful sale of Cal-O-Rex, a percentage of all "Proceeds" from the sale—including both cash payments and "any consideration derived through 'earn-outs' or similar contingent payment arrangements—*as they are paid to American Standard.* Agreement at ¶ 2(a)(i) and (ii). The Agreement was limited to a one-year term, giving Seale only one year to complete the sale, if at all. *Id.* ¶ 1. The Agreement was signed by G. Peter D'Aloia on behalf of American Standard in his capacity as Senior Vice President and CFO, and by James A. Seale on behalf of Seale, in his capacity as President. *Id.* at 7. All parties agree that the Agreement encompasses the totality of the agreement between American Standard and Seale. *See* Doc. 52, 55.

On December 13, 2000, Seale successfully sold Cal-O-Rex to Grupo Industrial Saltillo ("GIS"), through GIS' subsidiary, Pistones Industriales S.A. de C.V., ("PINSA"), for $68,000,000. *See* Doc. 1 at 3; *see also* Stock and Intellectual Property Purchase Agreement. The Cal-O-Rex sale was memorialized in two documents: (1) the September 29, 2000 Stock and Intellectual

---

[2] The assets of the Trane Cal-O-Rex water heater business are referred to in the Agreement as the "Unit." The Agreement refers to the all or part of the assets of the Unit as the "Transaction."

Property Purchase Agreement ("SIPPA") between American Standard Water Heater Corporation and PINSA and (2) the September 29, 2000 Social Participation Purchase Agreement between various subsidiaries of American Standard and PINSA. (Doc. 52 at 4-5). *Within* the SIPPA—one of the primary documents reflecting the Cal-O-Rex sale—GIS and American Standard executed the American Standard, Inc., ("ASI") Trademark License Agreement. *See* Doc. 57-1 at 40. This ASI Trademark License Agreement, allowed to GIS to, as part of the Cal-O-Rex purchase, use the American Standard trademark on its newly-acquired water heaters. *Id.* In exchange for the trademark use, GIS agreed to pay American Standard and its successors, 3% royalty payments of all water heater sales containing the American Standard trademark. *Id.*

Once the sale of Cal-O-Rex was complete, American Standard, as mandated under the Agreement, began paying Seale 5% of all Proceeds it received from the sale. (Doc. 1 at 4). Specifically, American Standard, from 2000-2008, paid Seale 5% of all royalty payments it received from GIS under the ASI Trademark License Agreement. *Id.* In 2008, Ingersoll-Rand acquired American Standard[3]. *Id.* After acquiring American Standard, Ingersoll-Rand continued to pay Seale, from 2008-2014, 5% of all Proceed payments resulting from the Cal-O-Rex sale. *Id.*; *see also* Doc. 52, 54. Since its payment in 2014 however, Ingersoll-Rand has stopped paying Seale its percentage of Proceeds from the Cal-O-Rex sale and has refused to pay Seale anything further. Doc. 1 at 4.

On October 26, 2015, Seale filed its Amended Complaint against Ingersoll-Rand alleging Breach of Contract, requesting an Accounting, and seeking a Declaratory Judgment. (Doc. 7). In response, on November 20, 2015, Ingersoll-Rand filed its Answer and Counterclaim, alleging Unjust Enrichment for Seale's receipt of the Proceed payments. (Doc. 11). On May 9, 2016, both

---

[3] At this point in 2008, American Standard, Inc. was operating under the name of Trane, Inc. Thus, technically, Ingersoll-Rand's acquisition of American Standard was an acquisition of Trane, Inc. American Standard has been retained for clarity.

Seale and Ingersoll-Rand filed cross-motions for summary judgment. (Doc. 51, 54).  The cross-motions are currently before the Court.

## II.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party. *Boitnott v. Corning, Inc.*, 669 F.3d 172, 175 (4th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (citations omitted).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (quoting *Anderson*, 477 U.S. at 247–48).

A "material fact" is a fact that might affect the outcome of a party's case. *Anderson*, 477 U.S. at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).  Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001).

A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## III.   ANALYSIS

The Court GRANTS Plaintiff Seale & Associates, Inc. Motion for Summary Judgment and DENIES Defendant Ingersoll-Rand's Motion for Summary Judgment because the plain language of the Agreement states that Ingersoll-Rand must pay Seale 5% of all Proceeds derived from the Cal-O-Rex sale and thus, no genuine issue of material fact exists.

### A. The Engagement Agreement Unambiguously Provides that Seale & Associates is Entitled to 5% of Ongoing Royalty Payments; Therefore, the Court Need Not Examine Extrinsic Evidence.

The Court GRANTS summary judgment in favor of the Plaintiff, without examining extrinsic evidence, because the Agreement is unambiguous on its face.

"[A]n unambiguous writing justifies summary judgment without resort to extrinsic evidence . . ." *World-Wide Rights Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir. 1992). The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face. *Id.* If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue. *Id.* Moreover, under Delaware law, which

governs the Agreement, a court interpreting a contract must "start by looking to the four corners of the contract to conclude whether the intent of the parties can be determined from its express language." *Paul v. Deloitte & Touche LLP*, 974 A.2d 140, 145 (Del. 2009). In so doing, "clear and unambiguous terms are interpreted according to their ordinary and usual meaning." *Id.* at 145 (citing *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006); *Rhone-Poulenc*, 616 A.2d at 1195).

Where a contract is unambiguous, "extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). A contract "is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Rhone-Poulenc*, 616 A.2d at 1196. As the Delaware Supreme Court has explained:

> Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty. *The true test is not what the parties to the contract intended it mean, but what a reasonable person in the position of the parties would have thought it meant.*
>
> *Rhone-Poulenc*, 616 A.2d at 1196 (internal citations omitted) (emphasis added).

Here, the primary issue surrounding the parties' cross-motions for summary judgment is whether, under the Agreement, Seale is entitled to receive 5% of the Proceeds that result from the sale of Cal-O-Rex. *See* Doc. 51, 54. In supporting their opposing positions on this issue, both Ingersoll-Rand and Seale submit numerous exhibits, declarations, and supporting documentation. *See id.* However, as noted in *World-Wide and Paul,* because the Agreement is unambiguous the Court can determine the parties' intent, and interpret the terms of the Agreement, simply by looking at the Agreement's express language. *See Paul*, 974 A.2d at 14. Accordingly, having looked at the four corners of the Agreement, the Court determines that

Ingersoll-Rand is required to pay Seale 5% of all Proceeds, and thus, the Court need not evaluate the parties' extrinsic evidence.

To start, the Agreement provides that American Standard, Ingersoll-Rand's predecessor, retained Seale to assist American Standard "in connection with the sale of all or part of the assets of its Trane Cal-O-Rex water heater business." Agreement at 1 ("[t]his letter sets for the our agreement appointing [Seale] as agent to assst [American Standard] on an exclusive basis in connection with the sale of all or part of the assets of its Trane Cal-O-Rex water heater business, (collectively, the "Unit") under the following terms[]"). The Agreement then states that, in light of such Agreement, American Standard must pay Seale (i) "a $100,000 up-front retainer" and (ii) if Seale successfully assists American Standard and its successors in selling the Trane Cal-O-Rex water heater business, a percentage "of *any* Proceeds . . . all contingent upon the closing of the Transaction." Agreement ¶ 2(a), 2(a)(i), 2(a)(ii), labeled "Fees" ("American Standard shall pay to Seale for its services hereunder the following fees"). Further supporting the requirement that American Standard pay Seale a set portion of Proceeds, the Agreement then explicitly lists the exact percentage of Proceeds Seale should receive, based on the total amount of Cal-O-Rex's sale. *See id.* at ii (stating that American Standard shall pay Seale a Minimum Fee of $200,000 "on *any* Proceeds" up to $38 million, *plus* 2% "of *any* Proceeds" if the sales exceeds $38 million up to $42 million, 3% if the sale exceeds $42 million up to $46 million, 4% if the sale exceeds $46 up to $50 million, and 5% of the all Proceeds if the sale is in excess of $50 million). *Id.* at 2(a)(ii).

In the very next paragraph, the Agreement clarifies that "Seale's fees under '[2](a)(ii)' above shall be due and payable on the date of closing of the Transaction. . . however . . .*as to any portion of [Seale's] fee . . . which is based on Proceeds* derived from 'earn-outs' or similar

contingent payments, *Seale's fee with respect thereto shall be paid over the term of such agreements as such Proceeds are received. Id.* at 2(b). This straightforward language indicates not only that American Standard must pay Seale a percentage of the Proceeds from the sale of Cal-O-Rex, but also details exactly how much (5%, because the total sale amounted to $68 million) and when ("as such Proceeds are received"). *See id.* Further clarifying the parties' intention, the Agreement then *defines* Proceeds as "the total of any cash payments plus . . . (iv) the actual amount of *any consideration* derived through 'earn-outs' or similar contingent payments *as they are paid to American Standard or any of its affiliates.*" Agreement ¶ 2(c). This definition of Proceeds reiterates that the parties, and in turn the Agreement, contemplated American Standard's *continual* receipt of various Proceeds as a result of the sale of Cal-O-Rex. Thus, under the Agreement, as Proceeds were paid to American Standard, American Standard was thus obligated to pay Seale 5% of such Proceeds. As the plain and ordinary meanings of the Agreement's language supports this conclusion, the Court finds no ambiguity in its finding. *See Rhone-Poulenc*, 616 A.2d at 1196 ("Ambiguity does not exist where the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.'"

Finally, though the language of the Agreement plainly requires American Standard to pay Seale 5% of all Proceeds, nothing more clearly indicates the parties' assent to the Agreement's plain terms than the fact that American Standard *complied* with the Agreement by actually paying Seale 5% of Proceeds. More precisely, in the year 2000—the very year that Seale helped successfully sell Cal-O-Rex—American Standard began paying Seale 5% of all Proceeds from the sale. Seale Dep. 73: 1-3, 13-21; Chicles Tr. at 40:10 – 43:10. American Standard continued to pay Seale 5% of all Proceeds until 2008, when it was then acquired by Ingersoll-Rand, at

which point Ingersoll-Rand *also* complied with the Agreement and diligently paid Seale 5% of all Proceeds from 2008 through 2014. (Doc. 11, 52, 55). These actions combined, resulted in Seale's receipt of Proceeds from Ingersoll-Rand and its predecessor American Standard, for nearly fourteen consecutive years. *See* Doc. 52, 55. These uncontested payments to Seale, along with the detailed and straightforward nature of the first four paragraphs of the Agreement— explaining the Term of the Agreement, the Fees, and the definition of Proceeds—unquestionably shows that Seale is entitled to 5% of all Proceeds American Standard, and its successor Ingersoll-Rand, receive from the sale of Cal-O-Rex. By suddenly refusing to continue to pay Seale 5% of all Proceeds, Ingersoll-Rand violated the Agreement. In light of this, the Court GRANTS summary judgment in favor of Plaintiff Seale because, in light of the plain language of the Agreement, no interpretive facts are in genuine issue.

### B. GIS' Royalty Payments to American Standard in Exchange for the Use of the American Standard Trademark constitutes "Proceeds" Because the Royalty Payments are Part of a "Contingent Payment Arrangement."

The Court finds that GIS' royalty payments constitute Proceeds, under the definition provided in the Agreement. In paragraph 2(c), Proceeds are defined as ". . . (iv) the actual amount of any *consideration derived through 'earn-outs' or similar contingent payments* as they are paid to American Standard or any of its affiliates." Agreement ¶ 2(c).

Here, as part of its purchase of Cal-O-Rex from American Standard—with Seale serving as the agent—GIS purchased an year exclusive license of the "American Standard" trademark to use while selling the water heaters in Mexico. *See* Doc. 52-9 Exhibit H, ASI Trademark License Agreement. The signed trademark agreement, executed in connection with the sale of Cal-O-Rex, is memorialized in the ASI Trademark License Agreement. *See id.* The ASI Trademark License Agreement is a part of and therefore, *contained within*, one of the key documents

reflecting the Cal-O-Rex sale—the Stock and Intellectual Property Purchase Agreement ("SIPPA")[4]. *See generally* September 29, 2000 SIPPA; *see id.* at 40; *see also* Doc. 52-9. As a result of the Cal-O-Rex sale's inclusion of the ASI Trademark License Agreement[5], *see* SIPPA at 40, GIS agreed to pay American Standard, and its successors, 3% of GIS' net sales, if any, of all water heaters sold with the "American Standard" trademark. *See* ASI Trademark License Agreement at 3; *see also* Doc. 58 at 7.

This 3% of GIS' net sales, considered royalty payments, is of course contingent on GIS' successful sale of water heaters containing the American Standard trademark, in Mexico. Put differently, GIS' payment to Ingersoll-Rand, of 3% of its net water heater sales, is a calculation based on the performance of the American Standard trademark rights acquired in the Cal-O-Rex sale. Therefore, Ingersoll-Rand is not guaranteed the receive payment from GIS; instead, the 3% is contingent on the success of American Standard's trademark, making the payments contingent payments. As contingent payments, paid to American Standard (and its successor Ingersoll-Rand), GIS's royalty payments are Proceeds, as outlined in paragraph 2(b) and 2(c) of the Agreement. In light of this, Ingersoll-Rand's continued receipt of GIS' contingent payments are within the definition of Proceeds, and Seale is unquestionably entitled to 5% of such payments.

### C. Seale & Associates' Entitlement to 5% of Ongoing Royalty Payments is Not Limited by the Engagement Agreement's Termination Paragraph.

The Court holds that, under the plain reading of the Agreement as a whole, the Termination paragraph does not preclude Seale from currently receiving Proceeds from

---

[4] Both Defendant and Plaintiff agree that the SIPPA (Doc. 57) is a true and accurate copy, accurately reflects the sale of the Trane Cal-O-Rex water heating business, and *includes* the American Standard Licensing Agreement.

[5] *See* Closing Memorandum – a document identifying "all actions necessary to complete Cal-O-Rex's acquisition" by GIS, stating the execution of the ASI Trademark License Agreement as "necessary to complete the . . . Transaction." Closing Memorandum (Umhoefer Deposition Exhibit 14) at 1, 11; Umhoefer Tr. at 141:22 – 142:9; *see also* Umhoefer Deposition at 2, 8 – 9 and Umhoefer Tr. at 146:7 – 149:6, noting that the SIPPA, which contains the ASI Trademark License Agreement, was *central* to closing the Transaction.

Ingersoll-Rand. "In interpreting a contract's clear and unambiguous terms, the Court must be mindful that a contract should be read as a whole, and every part should be read *as a whole*, and every part should be interpreted with reference to the whole. *Schwan's Home Serv. v. Microwave Sci., JV, LLC*, No. N11C-11-008, 2013 Del. Super LEXIS 259, at *18 *(Del. Super. June 24, 2013).

Citing paragraph 10 of the Agreement, labeled Termination, Ingersoll-Rand alleges that, even if Plaintiff were entitled to Proceeds, such entitlement only lasted for one year or thirty-six months after the termination of the Agreement. *See* Doc. 52. However, an ordinary reading of Paragraph 10's one-year and thirty-six month limitations make clear that the limitations do not pertain to the *Proceeds* of the Transaction. Specifically, paragraph 10 states:

> **10. Termination** – *This Agreement* will terminate one year after the date on which it is executed by American Standard, unless extended by mutual written consent of American Standard and Seale. For thirty-six (36) months following termination of this Agreement, Seale shall be entitled to the Fees outlined in paragraph 2(a) [specifying the retainer and the graduated percentage of "Proceeds"] less any amounts paid by American Standard pursuant to paragraph 2(d) [specifying fees in the event a American Standard declined an offer] in the event of the closing of any Transaction with a company or other entity, including any officers, directors, employees, or agents thereof acting individually or with others, which, during the term of this Agreement, approached American Standard or its affiliates, was identified to American Standard or its affiliates by Seale, was identified to American Standard or its affiliates by a third party, or was identified by American Standard or its affiliates or their officers, directors, agents, or employees.

Engagement Agreement ¶ 10 ("Termination Paragraph").

> i.   *Ingersoll-Rand's obligation to pay Seale 5% of all Proceeds did not terminate one year after the Agreement was executed.*

The first sentence of paragraph 10 explicitly states that the one year termination applies to the *Agreement* itself. *See id.* In paragraph 1, the Agreement is described as simply, American Standard's appointment of Seale to be its exclusive agent in the sale of Cal-O-Rex. *See id.* at ¶ 1. In other words, the first paragraph of the Agreement, aptly labeled in bold text as 'Term of

Agreement' states that the Agreement's term of one year merely encompass the period in which Seale is American Standard's exclusive agent, for the sole purpose of the selling Cal-O-Rex. *See id.* ("American Standard hereby appoints Seale *for a period of one year* from the date of execution . . . of th[e] Agreement (and any extension thereof) *as exclusive agent to assist in the sale of all or part of the assets*"). This, in turn, is reflected in the first sentence of paragraph 10, the Termination paragraph, which reiterates that the Agreement for Seale to be American Standard's agent expires after one year. *See* ¶ 10. Nothing in either the Term of Agreement paragraph (¶ 1) nor the Termination paragraph (¶ 10) says—or remotely suggests—that American Standard's obligation to *pay* Seale for its efforts during the one year it served as American Standard's agent, terminated after a year.

Moreover, Ingersoll-Rand's reading of the first sentence of the Termination paragraph conflicts with the express language of paragraph 2(b), which specifies that as to any portion of [Seale's] fees . . . based on Proceeds derived from "earn-outs" or similar contingent payments . . . *shall be paid over the term of such agreements as such Proceeds are received.* Agreement ¶ 2(b) (emphasis added). Thus, paragraph 10, paragraph 1, and paragraph 2(b) all plainly show that Ingersoll-Rand's obligation to pay Seale 5% of its Proceeds did not terminate one year after the contract was executed.

   ii. *Ingersoll-Rand's obligation to pay Seale Proceeds did not terminate thirty-six months after the Agreement's termination.*

Ingersoll-Rand argues that, even if it is required to pay Seale 5% of its Proceeds, the second sentence of the Termination paragraph, limits Ingersoll-Rand's fee payments to only thirty-six months after the Agreement is terminated. Ingersoll-Rand thus argues that, according to the *second* sentence in the Termination paragraph, Seale was only entitled to Proceeds until May 8, 2004.

The second sentence of the Termination paragraph states, in relevant part:

> For thirty-six (36) months following termination of this Agreement, Seale shall be entitled to the Fees outlined in paragraph 2(a) less any amounts paid by American Standard pursuant to paragraph 2(d) in the event of the closing of any Transaction with a company or other entity...."

Though Seale has presented extensive evidence that this sentence is simply a commonly-understood fee tail provision—and Ingersoll-Rand has presented no evidence to the contrary—the Court need not evaluate whether this sentence was meant as a fee-tail provision or in fact used for some other purpose because, when read in context with 1) the Termination paragraph and 2) the Agreement as a whole, it is clear that this sentence does not limit all proceeds Seale may receive to 36 months after the Agreement terminates.

First, the sentence at issue is located in the Termination paragraph—which itself describes a one-year time limitation. *See* ¶ 10. However, that one-year limitation is distinctly imposed only on *the time in which Seale is designated American Standard's exclusive agent. See supra i.* This shows that, the mere presence of a limiting timeline in the Agreement, and in the Termination clause, does not necessarily mean Seale's entitlement to Proceeds ends within that specified limitation. Instead, the sentence at issue solely addresses the termination of American Standard's assignment of Seale as its exclusive agent. This has no bearing on whether—*after* successfully serving as American Standard's agent and assisting in the sale of Cal-O-Rex—Seale is entitled to the ever-continuing Proceeds resulting from the sale.

Second, interpreting the sentences in the Termination clause—either with a one-year limitation or a one year and thirty-six month limitation—as terminating Seale's right to receive a percentage of the Proceeds, completely negates the four separate sections of the Agreement which plainly state the contrary. More precisely, Ingersoll-Rand's interpretation of the Termination paragraph is not plausible given the express provisions of paragraphs:

14

- **1** (stating that the one-year time period of the Agreement is simply the period in which Seale is American Standard's exclusive agent);

- **2(a)(ii)** (stating that Seale is entitled to 5% of *all* Proceeds if the Transaction is completed);

- **2b** (stating that all Fees due to Seale, that are "based on Proceeds derived from 'earn-outs' or similar contingent payments . . . shall be paid *as such Proceeds are received*"); and

- **c(iv)** (defining Proceeds as "the actual amount of any consideration derived through 'earn-outs' or similar contingent payment arrangements *as they are paid to American Standard or any of its affiliates* . . . ").

These four paragraphs, in addition to the first sentence in the Termination paragraph itself, clearly demonstrates the parties' intent that no time limit be placed on Seale's receipt of 5% of Proceeds derived from contingent payments. On the contrary, the four paragraphs show that the Agreement, as a whole, always contemplated that, once Seale successfully assisted American Standard sell Cal-O-Rex, it would *always* be entitled to a percentage of the Proceeds derived from that sale, as long as American Standard or its successors received them. *See Schwan's Home Serv. v. Microwave Sci., JV, LLC*, No. N11C-11-008, 2013 Del. Super LEXIS 259, at \*18 \*(Del. Super. June 24, 2013) ("In referring to the contract as a whole, the contract should be so interpreted as to give effect to its general purpose. In this regard, the court must interpret the contract so as to conform to *an evident consistent purpose* and in a manner that makes the contract internally consistent."). In light of this, this Court holds that neither time limit in the Termination paragraph apply to Seale's entitlement to 5% of all Proceeds. Rather, under the Agreement, Ingersoll-Rand is required to pay Seale 5% of all Proceeds, as they are received.

### D. Because, Under the Plain Language of the Agreement, Seale is Entitled to 5% of Ingersoll-Rand's Proceeds, this Court Grants Summary Judgment in Favor of Seale and Against Ingersoll-Rand.

#### i.    Seale's Breach of Contract claim

The elements for a breach of contract claim under Delaware law are: "(1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage to the plaintiff[]." *Greenstar, LLC v. Heller*, 814 F. Supp. 2d 444, 450 (D. Del. 2011). As set forth above, Ingersoll-Rand, as successor to American Standard, has a contractual obligation to pay Seale 5% of all royalty payments received from GIS. *See supra* at 6-15. Ingersoll-Rand has deliberately refused to pay Seale 5% of the Proceeds it receives from GIS, thus breaching the Agreement. Doc. 5; *see also* Doc. 11 and Doc. 52 at 6. This breach has damaged Seale as Seale has not received its portion of the trademark royalty payments under the Agreement. In light of these undisputed facts and the plain language of the Agreement, Seale has established all elements of a breach of contract claim. There remains no genuine issue of material facts as to whether Ingersoll-Rand breached the Agreement and thus, the Court GRANTS summary judgment in favor of Seale on its Breach of Contract claim.

#### ii.    Seale's Request for an Accounting

Delaware recognizes an action for an accounting. *See, e.g., Business Funding Group, Inc. v. Architectural Renovators, Inc.*, 1993 WL 104611, *2 (Del.Ch. March 31, 1993); *Schuss v. Penfield Partners L.P.*, 2008 WL 2433842, *11 (Del.Ch. June 13, 2008). A demand for an accounting may be granted either where there is a breach of fiduciary duty, or where there exist "other circumstances [that] render an accounting just and reasonable." *Schuss,* 2008 WL 2433842, *11. Here, Ingersoll-Rand admits that it continues to receive royalty payments from GIS, yet has not provided Seale nor the Court with documentation or information relating to

these payments. (Doc. 52, 55). Thus, Seale has consistently been unable to determine the amount it is owed under paragraph 2(a)(ii) of the Agreement. (Doc. 55). In light of this, and given that the discovery period has ended, the Court GRANTS Seale's request for an accounting as a matter of law. Ingersoll-Rand is ordered to pay the cost of an audit of the ASI Trademark License revenue and is ordered to grant Seale's auditors full access to conduct the accounting.

### iii.   Ingersoll-Rand's Unjust Enrichment Counterclaim

Ingersoll-Rand filed an Unjust Enrichment Counterclaim against Seale, seeking summary judgment. The counterclaim rests on the proposition that, by receiving 5% of Ingersoll-Rand's Proceeds, Seale was unjustly enriched. *See* Doc. 11.

To state a claim for unjust enrichment under Virginia law[6] "a plaintiff must allege three elements: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant knew that the plaintiff conferred the benefit; and (3) the defendant accepted or retained the benefit under circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." *Nossen v. Hoy*, 750 F. Supp. 740, 744-45 (E.D. Va. 1990). Here, it is undisputed that (1) Ingersoll-Rand conferred a benefit to Seale by paying Seale 5% of Proceeds from 2008-2014, and (2) Seale knew that Ingersoll-Rand conferred the benefit. However, as this Court has explained above, under the plain terms of the Agreement, Seale was and is currently, *entitled* to 5% of all Proceeds. Thus, none of the Proceeds Seale received were inequitable and the third element is not shown. *See* Agreement at ¶ 2(b). Thus, all of Ingersoll-Rand's Proceed payments to Seale were in accordance with the Agreement and there exists no issue of genuine fact on Ingersoll-Rand's Unjust Enrichment counterclaim. This Court therefore GRANTS summary

---

[6] Though Delaware law applies to the express contract, Virginia law applies to the unjust enrichment claim. *See Klaxon v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941).

judgment on Ingersoll-Rand's Unjust Enrichment counterclaim in favor of Seale and against Ingersoll-Rand.

### iv.    The Court Denies Seale's Request for a Declaratory Judgment

This Court holds that, given its grant of summary judgment in favor of Seale and against Ingersoll-Rand, there remains no legal uncertainty about Seale's entitlement to 5% of all Proceeds, which would warrant a declaratory judgment. Therefore, the Court DENIES Seale's request for a declaratory judgment.

A district court may decline to entertain a declaratory judgment when it has "good reason" to do so. *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 594 (4th Cir. 2004) ("[D]istrict courts have great latitude in determining whether to assert jurisdiction over declaratory judgment actions."). A district court need only grant declaratory judgment (1) when the judgment "will serve a useful purpose in clarifying and settling the legal relations in issue," and (2) when the judgment "will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Volvo*, 386 F.3d at 594 (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir.1937)).

Here, Seale's request for a declaratory judgment mirrors its request for summary judgment. In other words, Seale asks this Court to issue a declaratory judgment to declare its legal rights in relation to the Agreement and the Proceeds Ingersoll-Rand receives. However, as this Opinion and Order explicitly details the Court's holding on Seale's motion for summary judgment on its Breach of Contract claim, this Court DENIES Seale's request for a declaratory judgment.

> *v.   Seale is Entitled to its Costs and Attorneys' Fees Incurred in*
> *Connection with This Action.*

The Court holds that, under paragraph 6 of the Agreement, Ingersoll-Rand must

reimburse Seale for its costs and attorneys' fees in this action.

Paragraph 6 of the Agreement provides that:

> If an Indemnified Party [defined as "Seale and its controlling persons, affiliates, directors, officers, agents and employees] becomes involved in any action or legal proceeding in connection with any services or matters which are the subject of this   Agreement, *American Standard agrees to indemnify and hold the Indemnified Party harmless from any liability or claims and reasonable attorneys' fees and other expenses incurred with respect to preparing for or defending against such action or legal proceeding* . . ..

Agreement ¶ 6 (emphasis added).

The indemnification provision, by its express terms, specifically provides that Ingersoll-

Rand (as successor to American Standard) shall indemnify Seale from "*any* liability or claims

and reasonable attorneys' fees and other expenses incurred" either in "preparing for or defending

against" "*any* action or legal proceeding in connection with any services or matters which are the

subject of" the Agreement. *See id.* Unlike Ingersoll-Rand argues, simply because paragraph 6

focuses on "indemnification," does not mean Ingersoll-Rand's obligation to reimburse Seale for

its costs and attorneys' fees is limited to Seale's defense of third-party claims. To the contrary, in

*Kraft Foods N. Amer., Inc. v. Banner Eng'g & Sales, Inc.*, Judge Payne held:

> According to Black's Law Dictionary, "to indemnify" is "[t]o reimburse (another) for a loss suffered because of a third party's or one's own act or default." Black's Law Dictionary (8th ed. 2004). Thus, the plain meaning definition of indemnification does not limit reimbursement to losses suffered as a result of third party claims. Indeed, the Supreme Court of Virginia has rejected the argument that broadly worded indemnification agreements limit reimbursement for attorney's fees to cases where the plaintiff has been forced to maintain or defend an action against a third party.

446 F. Supp. 2d 551, 577 (E.D. Va. 2006).

19

Other courts have similarly held that indemnification clauses are not limited to third-party claims. *See Caldwell Tanks, Inc. v. Haley & Ward, Inc.*, 471 F.3d 210, 216 (1st Cir. 2006) ("Massachusetts law also has not adopted a special rule that requires indemnity contracts be read as only applying to third parties unless there is explicit language to the contrary.") and *Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1032 (9th Cir. 1992) ("The plain, unambiguous meaning of 'indemnify' is not 'to compensate for losses caused by third parties,' but merely 'to compensate.'").

Here, in light of the clear language of the Agreement, requiring Ingersoll-Rand to reimburse Seale in "*any*" legal action arising from the Agreement, the Court interprets paragraph 6 as simply requiring Ingersoll-Rand to reimburse Seale for its cost and attorneys' fees associated with the Agreement—even if Seale's suit is *against* Ingersoll-Rand itself. Thus, the Court holds that Ingersoll-Rand is required to reimburse Seale for all costs and attorneys' fees in connection with this suit.

In light of the foregoing, the court GRANTS summary judgment in favor of Plaintiff Seale and AGAINST Defendant Ingersoll-Rand.

## IV. CONCLUSION

For the foregoing reasons, this **GRANTS** Plaintiff Seale & Associates, Inc.'s Motion for Summary Judgment and **DENIES** Defendant Ingersoll-Rand Company's Motion for Summary Judgment. The Court finds that the Agreement unambiguously requires Ingersoll-Rand to pay Seale 5% of the royalty payments from GIS, because these are Proceeds as defined under the Agreement. In light of this, the Court holds that the parties' intent is clear, the Court need not review extrinsic evidence, and there remains no genuine issue of material fact. Accordingly, it is hereby,

**ORDERED** that Defendant Ingersoll-Rand Company's Motion for Summary Judgment (Doc 51) is **DENIED** and Plaintiff Seale & Associates, Inc.'s Motion for Summary Judgment (Doc. 54) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff Seale & Associates, Inc. is entitled to 5% of all of Grupo Industrial Saltillo's royalty payments, paid to Defendant Ingersoll-Rand Company or its successors, as long as Defendant Ingersoll-Rand Company receives such payments, in connection with the Cal-O-Rex sale.

**IT IS FURTHER ORDERED** that Plaintiff Seale & Associates, Inc.'s request for an Accounting is **GRANTED**. Defendant Ingersoll-Rand Company is ordered to pay the cost of an audit of the ASI Trademark License revenue and is ordered to grant Seale's auditors full access to conduct the accounting. Defendant Ingersoll-Rand Company shall deliver the requested documents to Plaintiff Seale & Associates, Inc. within ten (10) days of this Order.

**IT IS FURTHER ORDERED** that Plaintiff Seale & Associates, Inc.'s request for a Declaratory Judgment is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff Seale & Associates, Inc.'s request for costs and attorneys' fees is **GRANTED**. However, Plaintiff must first submit specific evidence demonstrating that precise costs and requested award of attorneys' fees, ensuring that the requested amount reflects the prevailing market rates and is reasonable.

**IT IS SO ORDERED.**

**ENTERED** this ___16th___ day of August, 2016.

Alexandria, Virginia
08 / 16 / 16

_____/s/_____
Gerald Bruce Lee
United States District Judge